KENNETH E. KELLER (SBN 71450) kkeller@kksrr.com
MICHAEL D. LISI (SBN 196974) mlisi@kksrr.com
KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Facsimile: (415) 249-8333

Attorney for Plaintiffs CRS RECOVERY,
INC. and DALE MAYBERRY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**(OAKLAND DIVISION)**

| | |
|---|---|
| CRS Recovery, Inc., a Virginia Corporation, and DALE MAYBERRY<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN LAXTON, aka johnlaxton@gmail.Com NORTHBAY REAL ESTATE, INC., TIGER-CDM, BARNALI KALITA, aka barnali.kalita@gmail.com, LI QIANG, aka JONATHAN LEE aka namowner@yahoo.com, RL.COM, MAT.NET, BULK REGISTER, WILD WEST DOMAINS, dba DOMAINCITY.COM and DOES 1 - 20<br><br>Defendants.<br><br>AND RELATED CROSS-CLAIMS. | Case No. CV 06-07093 CW (BZ)<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>**Trial Date:** May 7, 2012<br>**Pre-Trial Conf.:** April 25, 2012<br>**Time:** 2:00 PM<br>**Judge:** Hon. Claudia Wilken |

Plaintiffs CRS Recovery, Inc. ("CRS") and Dale Mayberry ("Mayberry") (collectively where appropriate "Plaintiffs") hereby submit their Opening Trial Brief in this matter.

## I.  INTRODUCTION

This is a simple and straightforward case of the theft of a domain RL.com that was stolen from Mayberry on December 23, 2004 by Li Qiang of mainland China ("Qiang"). Qiang immediately moved the domain name to a registrar China and later transferred it to an individual in India. That individual "sold" the domain name in May 2005 to Defendant John Laxton. Laxton essentially bought it with "no questions asked" and he did essentially no due diligence regarding the purchase of a valuable "two letter domain" for $15,000. Had he done any searching on the internet, he would have discovered a number of blog postings reporting that the domain had been stolen from Mayberry. Any due diligence would have revealed that Qiang is a known thief of domain names.

Since the domain had been stolen by Qiang, he never acquired any right, title or interest in the domain name nor would any subsequent "purchaser", including Laxton have obtained title to the domain. These transactions are void and the domain is rightfully owned by Mayberry, who has transferred his rights to the domain to CRS.

Realizing that the evidence of the theft of the domain is overwhelming, the defendants have raised weak defenses that Mayberry "abandoned" RL.com, which is completely untrue and/or that the domain was obtained by Qiang by fraud not theft. However, those defenses are doomed to fail.

The only result which is supported by the evidence will be that Qiang stole RL.com and there is no defense to the CRS's claims of conversion. Not only is CRS entitled to retain possession of the domain, but it will be entitled to recover significant monetary damages, as a result of the conversion and Laxton's interference with Mayberry's contracts with the registrar of the domain name, Network Solutions. Plaintiffs are confident that the jury will be able to cast aside the irrelevant and inconsistent arguments offered by Defendants, and will find for Plaintiffs on all claims.

## II.  STATEMENT OF THE CASE

### A.  Factual Background

On July 23, 1995, Plaintiff Dale Mayberry ("Mayberry"), who resides in Virginia, registered the unique domain name RL.com through a contract with Network Solutions, Inc. ("NSI"). There

are only a limited number of two letter domains available for registrations as ".coms" (there are only 676 two letter combinations of the twenty six letters of the alphabet). On October 5, 1995, Mayberry registered another domain, MAT.net with NSI for his company Micro Access Technologies ("Micro Access"). When one registers a domain name (the "registrant") with NSI (the "registrar"), the registrant sets up administrative, billing and technical contacts. Mayberry decided to use the same email address dale@mat.net – an email account hosted by MAT.net – as the email address Administrative Contacts for both RL.com and MAT.net.

To maintain a domain name registration, the registrant must pay yearly registration fees, which can be paid several years in advance or on a yearly basis. The records of NSI reflect that NSI would send email notices to Mayberry two months or so before the registrations of his domains would expire for RL.com and/or MAT.net as well as paper invoices and follow up emails. Often Mayberry would not pay the registration when they were due but would pay them several months thereafter. NSI never cancelled either registration when Mayberry would pay months after the registrations were due. He will testify that he believed that he would receive notices from NSI when his registrations were coming up for renewal and that he would have a significant amount of time even after the registrations "expired" to pay them. From 1995 through 2003, Mayberry consistently paid the fees for renewals of his registrations for MAT.net and RL.com. He never intended to abandon either domain name.

With respect to MAT.net, it was up for renewal on October 4, 2001. Mayberry received notices from NSI on September 6, 2001 (first Paper Invoice), October 8, 2001 (second Paper Invoice) and October 25, 2011 (10 Day Notice). Importantly, and as he had done in the past, Mayberry did not actually pay for the renewal until months after the "expiration date". The records of NSI reflect that the payment was made on February 19, 2002, (almost four months after it was due) for a two year renewal of MAT.net from October 5, 2001 to October 2003.

With respect to RL.com, the registration was up for renewal on July 23, 2002. On that date, Mayberry renewed his registration of RL.com for three years (the longest period of renewal he had ever paid for with respect to either RL.com or MAT.net), from July 23, 2002 to July 23, 2005.

1   Therefore, the registration for RL.com was fully paid for and current in December 2003, when it was
2   stolen by Qiang.

3   The two year registration for MAT.net was coming up for another renewal in October 4,
4   2003. For the first time in the 8 years that he had owned this domain, Mayberry did not receive any
5   notice that his registration was up for renewal, nor any paper invoice. The files of NSI indicate that
6   no notice of any kind, whether paper or electronic was sent to Mayberry regarding the expiration of
7   the domain registration on October 5, 2003.

8   Under the procedures of NSI in effect in 2003, when a registration expires, it enters an
9   automatic renewal period of "up to 45 days". During that period, the renewal fee is "paid" by NSI
10  through withdrawal from an account it maintains with the registry, Verisign. Therefore, as to
11  MAT.net, it entered this automatic renewal period on October 5, 2003. The parties "dispute whether
12  the automatic renewal period was actually 45 days or 30 days. However, at the end of the automatic
13  renewal period, if the domain has not been renewed by the registrant, the payment is reversed and it
14  enters the "redemption grace period". What technically happens at this time is that a "delete"
15  command is issued from the registrar (NSI) to the "registry (Verisign) and while the domain is not
16  actually deleted it is effectively deactivated. The records of Verisign will show that the delete
17  command was issued on November 17, 2003, which confirms that the automatic renewal period for
18  MAT.net was actually the full 45 days from October 5 and not the 30 days as Defendants assert.

19  Everyone agrees that the redemption grace period is 30 days. With respect to MAT.net, the
20  redemption grace period would expire on December 17, 2003. If the domain is not renewed during
21  the redemption grace period, it finally enters a 5 day "pending delete" period. Finally, at the end of
22  the pending delete period, the domain name is "dropped" and is available for anyone to try and
23  purchase and register it anew. Thus, MAT.net would not have been available to the public until
24  December 22, 2003. However, Qiang stole it from Mayberry before that time on December 18.

25  During all of these periods, the only person who can renew the registration of the domain is
26  the registrant. With respect to MAT.net, that would be Mayberry. However, shortly before the
27  expiration of the redemption grace period, Qiang apparently embarked on his scheme to steal both
28  MAT.net and RL.com.

1    The Verisign records show that on December 15, 2003, two days before the expiration of the
2    redemption grace period, a "restore" command was issued, which effectively takes the domain out of
3    the redemption grace period and "restores" the registration to its owner, Mayberry.  Mayberry has
4    testified that while he attempted to renew his registration in December, by this point it had already
5    been transferred to Qiang.

6    It would appear that Qiang had stolen Mayberry's identity and used it to restore the
7    registration for MAT.net on December 15 before it expired. Immediately thereafter, on December
8    18, 2003, the records of NSI show that Micro Access still was the registrant with Mayberry as the
9    Administrative Contact via dale@mat.net.  The next day, the registrant's account handle (e.g.
10   identifier) was changed to BSNT, and the phone numbers for the administrative contact Dale
11   Mayberry were changed to the bogus numbers "999-999-9999".   Furthermore, the "primary user"
12   became Ke Cul, which is an alias used by Qiang. Immediately thereafter, MAT.net was transferred
13   from Micro Access to a "partner account" held by Beijing Sinonets Network and Telecom ("BSNT")
14   with no fees being paid for this change in registrant name.  The servers hosting the domain where
15   changed from NSI's servers at WORLDNIC.net to BIM.com and the primary user and
16   administrative contact became Li Qiang (with a bogus telephone number 703-555-5555) and the NSI
17   account for MAT.net was deleted.

18   Mayberry never authorized these changes. What had occurred is that Qiang had stolen
19   MAT.net from Mayberry, and transferred to himself while at the same time moving it from NSI,
20   here in the United States to a server in China.

21   Now that Qiang had control of MAT.net and the email, dale@mat.net, he embarked on the
22   second phase of his larcenous plan, to steal RL.com using the stolen email its administrative contact,
23   dale@mat.net.  (Experts will testify that it would have been relatively easy for Qiang in 2003 to
24   determine that dale@mat.net was the administrative contact for both domains.)

25   On December 23, 2003 and while the registration for RL.com was fully paid for and current,
26   Qiang embarked again on a series of changes within NSI to now steal RL.com.  First, he changed his
27   email address at BSNT from lee@bim.com to dale@mat.net, thereby gaining control over all
28   communication to that email address, including domain registration accounts listing dale@mat.net as

1  the Administrative Contact's email.  Qiang's pattern of theft of MAT.net and RL.com mimicked a
2  patter of hijacking which was occurring with respect to the theft of domain names.
3         After he changed his email address, Qiang initiated a request to transfer RL.com from
4  Mayberry to himself, requesting the transfer from his new email address at 2:07:01 AM EST through
5  a computer identified as IP 218.0.215.159.  (This is the computer located in China)  As a result of
6  the transfer request, NSI automatically generated an authorization email to the Current Account
7  Holder/Administrative Contact, who must approve the request.  Mayberry was the administrative
8  contact for RL.com on December 23.  However, since Qiang had taken control of the email
9  dale@mat.net without the knowledge or consent of Mayberry, Qiang "intercepted" the authorization
10 email.  The domain that Mayberry had owned for more than 8 years was then hijacked in less than
11 54 seconds, as follows:
12        1.  2:07:01 AM EST:  Qiang initiates the transfer request
13        2.  2:07:02 AM EST:  NSI looks up the Authorizing Account Holder whose email
14            address was listed as dale@mat.net.
15        3.  2:07:11 AM EST:  NSI sends an email message intended for Mayberry explaining the
16            request to transfer RL.com from his account to Qiang.  NSI request Mayberry's
17            authorization to proceed and provides a reply link to authorize the changes.
18        4.  2:07:54 AM EST NSI receive a "response" purportedly from Mayberry authorizing
19            the transfer to Qiang.
20        5.  2:07:55 AM EST NSI completes the transfer of the RL.com domain name from
21            Mayberry to Qiang.
22        It is beyond implausible that the Authorized Contact for RL.com would be online at 2:07 AM
23 precisely at the moment that NSI sent the authorizing request, unless he was expecting the email
24 with his computer on and ready to reply.  The reply in this case took 33 seconds to occur.
25        Once he had control of RL.com, that same morning about four hours later, Qiang once again
26 moved the domain for RL.com from NSI to BIZCN.com, which is a Chinese registrar.  Approval of
27 this registrar transfer request was received at 7:48:03 AM EST notwithstanding that the sponsoring
28 registrar's software lookup found no current Administrative Contact for RL.com.  The transfer to the

new registrar was completed five seconds later at 7:48:08. The servers for RL.com were then changed from MAT.net to BIM.com, the same servers hosting the MAT.net domain now controlled by Qiang. His theft of RL.com, done without the knowledge or consent of Mayberry was complete.

Once in Qiang's possession, RL.com underwent a number of further changes in registration and control, none of which Mayberry knew of until long after the fact. On February 3, 2004, RL.com was transferred to a new registrar called Directi.Com, and the registrant was changed to "Tiger-CDM," listing a street address in India. On or about July 10, 2004, RL.com was transferred to Enable Communications, listing a street address in Bangalore. On November 7, 2004, RL.com was transferred to a new registrant, "Barnali Kalita," also listing an address in Bangalore. In May, 2005, Laxton bought RL.com from Barnali Kalita and he then transferred the domain to Defendant NORTHBAY.[1]

Laxton bought RL.com Barnali Kalita for $15,000, paid via two PayPal payments of $7,500 on May 6, 2005 and May 20, 2005, pursuant to an agreement that Laxton would make the second payment after Kalita transferred RL.com to his name. Laxton did not follow the custom and practice of using an escrow company, such as escrow.com for the transaction. Laxton never asked Kalita whether he had any right to sell RL.com, and conducted virtually no due diligence to determine whether Kalita had title to RL.com. As Plaintiffs' expert will testify, there were numerous red flags that suggested title of RL.com was in question and that it was stolen, and yet Laxton turned a blind eye to the issue. Instead, Laxton negotiated with Barnali Kalita via email, but he thereafter destroyed the emails, and has no substantial recollection of their contents.

On February 27, 2006, counsel for CRS sent a formal demand letter to Laxton, following up on an oral request, asking Laxton to return the domain name to Mayberry. Laxton refused to return the domain.

In February 2008, CRS – through its counsel – was able to obtain MAT.Net from the original hijacker, Li Qiang paying Qiang for the privilege of recovering property that he had stolen from

---

[1] Northbay remained in possession of the domain until it was turned over to CRS pursuant to the Court's order (Docket No. 173).

Mayberry. Pursuant to the terms of the original assignment from Mayberry to CRS, CRS transferred registration of the MAT.net domain to Mr. Mayberry. As such, the remaining claims in this action seek return of the RL.com domain name, and monetary damages flowing from its conversion and the interference with Mayberry's contract with NSI.

### B. Procedural History

Plaintiffs filed the Complaint in this action on November 15, 2006 and a Second Amended Complaint on October 30, 2007, naming Northbay and Laxton as defendants, among others.[2] (Dkt. No. 51). On November 9, 2007, Defendants Laxton and Northbay responded to the Second Amended Complaint. On September 26, 2008, the Court issued an Order Granting Plaintiff's Motion for Summary Adjudication and Denying Responding Defendants' Motion for Summary Adjudication and ordered that Northbay turn over RL.com to CRS

Following Defendants' appeal, the Ninth Circuit affirmed this Court's decision to apply California law, but found that factual issues existed that prevented summary judgment with respect to Responding Defendants' abandonment and good faith purchaser defense. *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1145 (9th Cir. 2010). The Ninth Circuit remanded the case for further proceedings. The case is now set for trial on May 7, 2012.

### III. CLAIMS AND DEFENSES AT ISSUE

Plaintiffs allege four claims for relief: 1) conversion; 2) intentional interference with contract; 3) unfair competition under Cal. Bus. & Prof. Code § 17200; and 4) declaratory relief. As discussed in greater detail below, Plaintiffs seek monetary and equitable relief.[3]

### A. Conversion

#### 1. The Evidence Supports Plaintiffs' Conversion Claim

Plaintiffs first allege a claim for conversion. *Burlesci v. Petersen*, 68 Cal. App. 4th 1062,

---

[2] The Complaint also named, among others, Tiger-CDM, Barnali Kalita, Li Qiang, and Guan Yu as additional defendants. None of the additional defendants have never appeared. As noted above, Plaintiffs were able to locate Li Qiang and obtained MAT.net by means of a settlement.

[3] The claim originally contained allegations of conversion and conspiracy to convert. In an attempt to streamline the issues for trial, Plaintiffs have elected not to pursue the conspiracy allegations.

1066 (1998) (internal citations omitted) ("Conversion is the wrongful exercise of dominion over the property of another. . . questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial."). The Ninth Circuit, applying California law, has held that Internet domain names are property and subject to a conversion claim. *Kremen v. Cohen*, 337 F.3d 1024, 1030, 1035 (9th Cir. 2003). Since California law is to be applied in this case, the domain name RL.com is property that can be the subject of a conversion claim. Mayberry made a formal written demand that Laxton return the registration of RL.com but Laxton refused to comply.[4] Moreover, "[p]ossession of the property coupled with refusal to return it is sufficient to support a defendant's liability for conversion." *See Express Media Group, LLC v. Express Corp.*, Case No. C 06-03504, 2007 WL 1394163, * 4 (May 10, 2007, N.D. Cal.) (citing to *Schroeder v. Auto Driveway Co.*, 11 Cal. 3d 908, 918 (1974)).

That is precisely the case here. Plaintiffs have been and are the rightful owners of the domain name RL.com. Defendants obtained possession of RL.com after it had been stolen by Qiang in 2005. In addition, Laxton refused Plaintiff's demand to turn over the converted property. Those facts are enough to establish the conversion claim, and support the return of RL.com to Plaintiffs and an award of monetary damages.

### 2. The Asserted Defenses Are inapplicable and Unsupported by the Evidence

Defendants' principal defenses to the essentially overwhelming evidence of theft and conversion are that (a) Plaintiff's abandoned the RL.com and MAT.net domains, and (b) that RL.com was obtained from Plaintiffs by fraud, rather than theft, and thus Laxton and Northbay were good faith purchasers. Defendants also assert the equitable defenses of waiver, estoppel and unclean

---

[4] In July, 2005, Mayberry transferred all of his right, title and interest in RL.com to CRS, a Virginia corporation for valuable consideration. In that same transaction, Mayberry transferred to CRS the right to recover MAT.net, with the understanding that, when CRS recovered MAT.net, CRS would transfer the registration back to Mayberry. CRS is thus the assignee of the rights to recover RL.com and MAT.net and damages associated with the loss of their profitable use, and stands in the shoes of Mayberry. Defendants contest the validity of that assignment, as well as Plaintiffs' standing to prosecute this case. Those issues are the subject of the currently pending Motion to Dismiss, and for the sake of brevity, will not be repeated here.

hands. None of those defenses have merit. As discussed above, and as this Court previously found, the evidence here amply demonstrates that the domain names were obtained by theft, and not by fraud. Similarly, the evidence overwhelmingly established that Mayberry did not abandon those domain names.

### a) Abandonment Defense

Defendants contention of "abandonment" not only lacks evidentiary support, but, in fact, strains credulity.

First, Defendants contend that Mayberry abandoned MAT.net by failing to "timely renew" his registration of that domain name. The evidence at trial, however, will show a far different story. It will be proven that Mayberry never received the usual email notices and paper invoices notices that he had traditionally received for over 8 years in connection with the renewals of MAT.net. Mayberry will testify that he did not intend to "abandon" MAT.net and he fully intended to renew the registration as he had done repeatedly in the past. In fact, he attempted to renew the domain in December but by the time he did so, it had been stolen by Qiang.

Furthermore, Defendants claim that MAT.net expired, was deleted and therefore available for anyone to register. They are simply wrong. Contrary to the claim by Defendants' expert, Dr. Levine, the domain name did not become available for anyone to register in November 2003.[5] Rather, the evidence from the registrar, NSI, and the registry, VeriSign, show that he domain name was not yet publicly available at the time it was converted by Qiang. Specifically, the evidence will show that the "delete" command was given on November 17, 2003, thus establishing – contrary to Mr. Levine's suggestion that the automatic renewal period was typically only 30 days – that the automatic renewal period lasted the full 45 days.

Moreover, the evidence will show that a "restore" command was given two days before the end of the redemption grace period. Since Mayberry did not request the "restore" command, it would appear that Qiang stole Mayberry's identity and used it to first restore MAT.net and then to

---

[5] In his deposition, Mr. Levine conceded that his statement was in error, and that he had forgotten that the automatic grace period of up to 45 days afforded to registrants by NSI was further extended by a 30-day Redemption Grace period, and a 5-day pending delete period.

transfer it to himself and to move it to a registrar in Chain. As such, there is simply no evidence of abandonment, and Qiang's acquisition of the MAT.net domain name was nothing more than theft.

Moreover, even if MAT.net had been abandoned, that does not mean that RL.com was abandoned as well. Yet Defendants contend that Dale Mayberry "abandoned" RL.com because he failed to change the Administrative Contact when he lost control over MAT.net, even though Mayberry did not know that he had lost control of MAT.net, there is no dispute – and Mr. Levine admits – that Mayberry had already renewed the RL.com registration through 2005. Consequently, even if Mayberry had allowed his registration of MAT.net to expire – which he did not – that does not mean that he also "abandoned" RL.com. Indeed, Mr. Levine admitted at his deposition that the acquisition of MAT.net did not confer upon Qiang any rights to RL.com. It make no sense to argue that intangible property like a domain is abandoned when the owner has paid to keep it registered for a term of years, under his true name with valid contact information. Mayberry's payment of a three-year registration valid through July 24, 2005 negates any possible claim of abandonment of RL.com. Thus, at a minimum, the abandonment defense has no relevance to whether RL.com was stolen by Qiang.

Faced with that evidence, Defendants seek to stretch the concept of abandonment beyond its proper scope. It appears that Defendants will argue that, once he realized that his domain names had been hijacked, Mayberry did not try "hard enough" to re-acquire them, and that this somehow shows intent to abandon them. Similarly, it appears they may argue that Plaintiffs' decision not to participate in a World Intellectual Property Organization ("WIPO") dispute between Ralph Lauren and Laxton concerning ownership of RL.com demonstrates an abandonment of Mayberry's claim to that domain name. Not only does that make little sense – particularly given that this lawsuit was filed a few weeks after the WIPO action – but defendants' theory ignores the fact that Plaintiffs had demanded the return of RL.com months earlier, and Laxton had refused. In any event, a finding of abandonment requires a clear expression of such intent, something that is simply lacking here. *See Hopson v. Nat'l Union of Marine Cooks & Stewards*, 116 Cal.App.2d 320, 253 P.2d 733, 735 (1953) (a defendant must show a "clear, unequivocal, and decisive act" demonstrating a waiver of property

1 rights). [6]

### b) Good Faith Purchaser Defense

Defendants next argue that even if the RL.com domain name was, in fact, converted, the conversion was by means of fraud, rather than theft. This distinction, although meritless, is critical to Defendants' efforts to portray themselves as good faith purchasers. Under California law, a thief cannot transfer valid title. As explained in *Naftzger v. American Numismatic Society*, 42 Cal. App. 4Th 421, 49 Cal. Rptr. 2d 784 (1996):

> Under the facts as pled, Naftzger is innocent of any wrongdoing and was unaware of the theft when he purchased the coins. Even if Naftzger is an innocent purchaser, however, he did not acquire valid title to the coins, assuming they were stolen, because a thief cannot transfer valid title. On this record, Naftzger's obligation to return the coins will be established if and when the museum proves the coins are its stolen property.

That analysis applies here as well. When Qiang transferred RL.com to himself by stealing it, the transfer was void ab initio. Since Li Qiang could not pass better title than he acquired by theft, Barnali Kalita, Laxton, and Northbay also acquired void title. *See also FTC v. J.K. Publ'ns*, 2001 U.S. Dist. LEXIS 26220, *41, (C.D. Cal., Jan. 18, 2001). *Morgold, Inc. v. Keeler*, 891 F. Supp. 1361, 1366 (N.D. Cal. 1995). Further, the good faith purchaser doctrine cannot apply here because Mayberry never voluntarily transferred RL.com. *Suburban Motors, Inc. v. State Farm Mut. Auto. Ins. Co.*, 218 Cal.App.3d 1354, 1359-61 (1990). The application of the good faith purchaser doctrine turns on the answer to a simple question – did the plaintiff transfer the property voluntarily or involuntarily. *Id.* at 1359-61. Where, as here, the transfer was entirely involuntary, the transferee "title" is void. Accordingly, the good faith purchaser doctrine does not apply.

Defendants nonetheless contend that Qiang converted the property from Mayberry by fraudulent acts. Yet any conduct by Qiang – including any misrepresentation of fact – was directed at NSI, not at Mayberry. If fraud on NSI – assuming it existed here – were enough to negate a

---

[6] Dr. Levine also suggests in his report that the lack of a live website at www.RL.com prior to the hijacking is evidence of Mayberry's "abandonment" of that domain name. Levine points to no rule from any governing body establishing that the failure to maintain a website at a domain should be considered abandonment of the registration of the domain.

registrant's title to a domain name, there would never be any remedy against domain name theft because all a hijacker would need to do would be to find an "innocent" purchaser and transfer the stolen domain name. Such a result makes little sense.

Indeed, in *Express Media Group, LLC v. Express Corporation*, Case No. C 06-03504 WHA, 2007 WL 1394163 – a case factually aligned with this case – the court found for plaintiffs and ordered the return of the stolen domain name. In that instance, someone impersonated plaintiff's attorney and transferred the plaintiffs' domain name to defendants. The court found that defendants "committed a wrongful act in retaining possession of the domain name," and concluded that because the domain name hijacking involved an "involuntary transfer" that "results in void title," a "good faith purchaser defense" may not be asserted. *Id.* at *4-*5 (citing Cal. Com. Code § 2403(1) and *Suburban Motors*, 218 Cal.App.3d at 1360-61).

Defendants' theory suffers from another flaw. Defendants spend much of their expert's report suggesting that, by allegedly abandoning, MAT.net, Mayberry also abandoned RL.com. But, in truth, how MAT.NET was acquired by Li Qiang is largely irrelevant. Qiang usurped the dale@mat.net email address, blocked Mayberry from receiving emails regarding the registration of RL.COM, intercepted NSI's authorization email addressed to Mayberry, and forged a reply that simulated Mayberry's approval of the transfer of RL.com to Li Qiang. Qiang's acquisition of the MAT.net domain, by lawful or unlawful means, conveyed no right to intercept the emails of MAT.net's users, to exploit their email addresses as security passcodes, or to convert their personal property, any more than possession of the keys to an apartment entitles a landlord to steal a tenant's furniture.

### 3. Equitable Defenses

Defendants also assert the equitable defenses of waiver, estoppel and unclean hands. None of these defenses has merit.

First, the waiver defense is based on the theory that subsequent to the theft of RL.com, Plaintiffs acted in a way that was "inconsistent" with their intent to enforce their rights. It appears that the basis for this is communication between CRS and Kalita as to the possible sale of RL.com, or that Plaintiffs did not join in the WIPO action by which Ralph Lauren sought to acquire RL.com.

1  Neither argument has merit. This theory is essentially an extension of the abandonment defense, yet
2  once again the "evidence" on which it is based does not evince any clear intent to relinquish
3  Plaintiffs' ownership rights. The act of communicating with Kalita about the availability of RL.com
4  would, at most, show that Plaintiffs were attempting to recover their property – not that they were
5  waiving a claim. Indeed, the actual communications with Kalita show that CRS was expressing its
6  view that RL.com had been stolen and rightfully belonged to CRS. Kalita resided in India, and thus
7  bring a lawsuit against him was hardly an option for Plaintiffs, and thus it would be consistent with
8  their desire to recover their property that they would contact him.[7] Nor can the decision not to join
9  the WIPO action be construed as an affirmative waiver – that action was brought against Laxton,
10 who had, just months before, refused to return the RL.com domain name to Plaintiffs.  Indeed,
11 Plaintiffs initiated this lawsuit a few weeks after the WIPO action was filed – that fact alone
12 eviscerates the suggestion of waiver.

13      Similarly, the Defendants' estoppel defense is based on their position that by communicating
14 with Kalita about the possible sale of RL.com before Laxton acquired it, CRS essentially gave Kalita
15 the imprimatur of legitimacy, and thus led Laxton to believe that Kalita was the true owner of
16 RL.com. Yet Laxton claims that he knew nothing about CRS and Mayberry, thus how could he have
17 relied on any such discussion between CRS and Kalita. Moreover, the fact that CRS may have
18 inquired as to the availability of RL.com from Kalita cannot be taken in good faith as a sign that
19 CRS was acquiescing as to Kaila's rights in RL.com. Like Defendants' abandonment theory, this
20 defense stretches he equitable principles of estoppel to their breaking point.

21      Finally, the unclean hands defense – which also appears to be based on either the
22 communications with Kalita or the WIPO action (or both) suffers from similar weaknesses.
23 Plaintiffs did nothing wrong in either instance – rather, on the one hand, they were attempting to
24 recover their property, and on the other, they chose a different forum to contest their rights to
25 RL.com. Like the other equitable defenses, the unclean hands argument should be rejected.

---

[7] The fat that they were able to trace RL.com to Kalita also undermines Laxton's suggestion that he could not, even if he had tried, have determined the rightful owner of RL.com.

B.     **Intentional Interference with Contract**

The evidence also supports Plaintiffs' claim for intentional interference with contract Specifically, it is undisputed that Mayberry entered into registration contracts with NSI to provide domain name registration services for RL.com and MAT.net, which provided that only Mayberry would be permitted to change the registration specifications with regard to these domain names. Defendants intentionally interfered with NSI's performance of the contracts by misrepresenting themselves as Mayberry, and the other wrongful conduct alleged above, resulting in Mayberry's loss of control over the domain names RL.com and MAT.net.

The principal defense offered to this claim appears to be that Laxton did not know of the contract between NSI and Mayberry. However, it is beyond question that Laxton had, at a minimum, constructive knowledge of that contract. Laxton himself owned over 900 domain names, and was plainly familiar with the practices of registrars like NSI. Moreover a simple Google search at the time he acquired the domain name – like Mr. Lau conducted – would have shown Laxton that there was a dispute as to the ownership of RL.com, and that Mayberry contended that RL.com had been stolen from him. The willful blindness of Laxton should protect him in this instance.

C.     **Unfair Competition**

Plaintiffs also assert a claim for unfair competition under California Business & Professions Code section 17200 ("UCL"), premised on the conversion of MAT.net and RL.com, and the interference with Mayberry's contract with NSI. There can be no dispute that such unfair and unlawful acts form a predicate for claim under Section 17200. *Cortez v. Global Ground Support, LLC*, Case No. 09–4138, 2009 WL 4282076, 3, (November 25, 2009, N.D. Cal.).

D.     **Declaratory Relief**

The evidence also establishes an actual controversy exists between Plaintiffs and the Defendants, in that Plaintiffs are entitled to a declaration that they have sole and exclusive rights: to control the identity of the Registrant, Administrative Contact and Technical Contact for the RL.com and MAT.net domains in the worldwide Whois database; to reverse the effect of fraudulent transfers effected by identity theft and the use of forged documents of transfer; to obtain return of the RL.com and MAT.net domains; and, to recover all funds wrongfully obtained by the Defendants by the

usurpation of Plaintiffs' rights.

## IV. RELIEF SOUGHT

Plaintiffs initially seek the return of the converted property, in addition to monetary damages. Cal. Civ. Code §§ 3379, 3380. *See Express Media Group, LLC v. Express Corp.*, 2007 WL 1394163, * 4 (N.D. Cal. 2007). Under the UCL, a private plaintiff is entitled to restitution of property. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1145 (2003). Here, the domain name has been transferred to Richard Lau of CRS, but because of this pending lawsuit, he does not have complete control over it. Therefore, this Court should confirm its previous order transferring the domain to CRS and order that Northbay relinquish all rights to RL.com, authorizing CRS to use it without limitation.

Plaintiffs are also entitled to a judgment declaring that Plaintiffs have: the right to use the domain name RL.com without restriction, including to control the identity of the Registrant, Administrative Contact and Technical Contact for the RL.com domain in the worldwide Whois database; and the right to reverse the effect of fraudulent transfers effected by identity theft and the use of forged documents of transfer. Plaintiffs therefore seek an injunction permanently enjoining Northbay from interfering with the rights of CRS to appear as the Registrant and Administrative Contact for RL.COM in the Whois database of domain name registrations and from interfering with the rights of CRS to possession, control, and use of RL.COM; and for an order directing Northbay and its agents and representatives to deliver possession and control of the RL.COM domain to CRS by initiating transfer of the registration for RL.COM to Richard Lau as Administrative Contact for CRS, with an email address of Richard@lau.com, and such other relief as is appropriate.

Even though CRS has had possession of RL.com, in light of the continuing legal dispute over its ownership of RL.com (through the appeal to the Ninth Circuit and the remand for further factual determinations), CRS has not been able to "commercialize" the domain name. Therefore, Plaintiffs are requesting that Defendants be awarded the amount of lost profits suffered as a result of loss of use of the domain name RL.COM. This relief is specifically tailored to Defendant's wrongful conduct.

While the general rule is that the value of the converted property is the appropriate measure

15
PLAINTIFFS' TRIAL BRIEF
CASE NO. CV-06-07093 CW (BZ)

of damages, a party may recover an "alternative measure" of damages where damages based on the value of the converted property would be manifestly unjust. *Lueter v. State of California*, 94 Cal. App. 4th 1285, 1302 (2002). Here, the alternative measure of damages should be used because determining damages on the basis of "value" would be manifestly unjust. The "value" of the domain name at the time of the conversion was no less than $400,000. However, the actual damages that Plaintiffs suffered are the loss of use of the domain name and the lost profits that naturally flow from its use.

Had RL.com not been converted, it would have operated as an online radio station beginning in approximately January 2007. Currently, CRS owns and operates a website that serves as an online radio station, which began operation in January, 2007, as RL.com would have. The amount of profits lost by CRS by virtue of not being able to use RL.com is approximately $1.2 million.[8] Plaintiffs are also entitled to post-judgment interest. *See* 28 U.S.C. § 1961 ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

Plaintiffs are also entitled to be reimbursed those monies spent to get its converted property back. Those costs previously totaled $4,315.93 and are now higher. (*See* Plaintiff's Bill of Costs in Support of Motion for Final Default Judgment and Permanent Injunction, Dkt. No. 232). This amount is consistent with Plaintiffs' cost of suit – as set forth below – as thus there are two grounds for awarding that sum. (*See* FRCP 55(b)(2)).[9]

## V.     CONCLUSION

This is a clear and simple case of hijacking of a domain name. In 2003, it was Mayberry's intent to continue to enjoy the benefits of two domains that he had first registered over eight years

---

[8] Plaintiffs are also entitled to lost profits for their intentional interference with contract claim. In actions involving intentional interference with contracts, the measure of damages is "'an amount that will reasonably compensate plaintiff for all loss or harm, providing that [it was] suffered by plaintiff and caused by the defendant's conduct.'" *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 232 (2005) (*citing to* BAJI 7.89 and *Youst v. Longo*, 43 Cal. 3d 64, 71, fn 6 (1987) (damages for interference with prospective economic advantage are "economic harm to the plaintiff proximately caused by the acts of the defendant.")). "The amount of such harm or loss includes "[t]he financial loss of the benefits of the [contract] [or] [the prospective economic relationship]." *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th at 232 (citing to BAJI 7.89).

[9] The court previously approved this amount of costs after it granted Plaintiffs' Motion for Summary Adjudication (which was then overturned). (Dkt. No. 194).

before. Through no fault of his own, an unscrupulous individual circumvented the security of Network Solutions and stole not one, but two domains. He moved those domains around the globe and unfortunately Laxton did not due diligence and bought stolen property. The law is clear. He cannot keep it and it must be returned to its rightful owners.

Dated:  April 11, 2012                               KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP


By:    /s/ Kenneth E. Keller
       KENNETH E. KELLER
       Attorneys for Plaintiffs CRS Recovery, Inc. and
       Dale Mayberry